[No. 19023. *En Banc.* June 1, 1926.]

THE STATE OF WASHINGTON, *Respondent*, v. TAKA HIRABAYASHI *et al.*, *Respondents*, WHITE RIVER GARDENS, INCORPORATED, *et al.*, *Appellants.*[1]

Appeal from a judgment of the superior court for King county, Hall, J., entered April 15, 1924, upon findings in favor of the plaintiff, in an action to escheat alien lands, tried to the court. Affirmed.

*Guie & Halverstadt* and *Ralph H. Higgins*, for appellants.

*Malcolm Douglas, Ewing D. Colvin*, and *Arthur Schramm, Jr.*, for respondents.

ON REHEARING.

PER CURIAM.—The above cause having been reheard *En Banc*, the majority of the court still alhere to the result reached in the opinion of the Department as reported in 133 Wash. 462, 233 Pac. 948.

The judgment is therefore affirmed.

PARKER, J. (dissenting)—I feel constrained to dissent from the views and conclusions of the majority of the judges, as expressed in the Department opinion to which they adhere. While I do not seriously controvert the facts, as stated in the department opinion, I desire to here briefly summarize them, as I see them in this record, to the end that my views may be more readily understood.

On February 11, 1919, D. K. Welt, being the owner and holder of the legal title to the land in question, entered into a written contract for the sale thereof to A. I. Maltby, receiving a cash payment on the agreed purchase price, the balance to be paid in deferred installments. Thereafter, on the same day, Maltby entered into a written contract for the sale of the land to Alfred T. White for $15,000, receiving from him a cash payment of $5,000 on the purchase price, the balance to be paid in deferred installments, corresponding, as to amounts and dates, with the deferred installments specified in the contract between Welt and Maltby. The $5,000, paid upon the purchase price by White to Maltby, was furnished by the alien Japanese defendant Katsuno to White, for the purpose of having White purchase and make the initial payment for the land. Thereupon, Katsuno moved upon the land and has ever since lived thereon, whether occupying it all this time in his own right or as an employee of the White River Gardens, Inc., is a matter of controversy. The evidence warrants the conclusion, that the $5,000 was furnished by Katsuno to White and the land contracted for by him, in compliance with an understanding between them that White was to con-

[1]Reported in 246 Pac. 577.

tract for, and hold, such contract interest in the land, with a view of the organization of a corporation and the ultimate vesting of the title of the land in such corporation; Katsuno evidently having in mind the vesting of the ownership of practically all of the shares of the capital stock of such corporation in his minor daughter, Yoshiko Katsuno, who is a native born citizen of the United States. There was never any written evidence of this trust, so, of course, it was a mere resulting trust, by virtue of Katsuno furnishing the $5,000 to White to make payment on the purchase price of the land. *Farrell v. Mentzer*, 102 Wash. 629, 174, Pac. 482.

Thereafter, there was duly organized and incorporated, under the laws of this state, the White River Gardens, Inc., with a capital stock of $20,000, divided into 2,000 shares of ten dollars each; Katsuno subscribing for 1997 shares and White, N. G. Murphy and R. H. Higgins each subscribing for one share. Thereafter on September 18, 1919, White duly assigned to the White River Gardens, Inc., all interest in the contract with Maltby for the purchase of the land. This was done, manifestly, in compliance with the wishes of Katsuno and the understanding theretofore existing between him and White. This, manifestly, was also done with intent on the part of Katsuno and the trustees of the White River Gardens, Inc., that the contract interest in the land be received by the corporation in part payment, at least, of Katsuno's subscription for the 1997 shares of the stock of the corporation. Whatever question there may be as to Katsuno having fully paid for his stock subscription, it is at least certain that this transfer of the sale contract interest of White, in the land held by him for Katsuno, by virtue of the trust resulting from Katsuno's furnishing the $5,000 to pay on the purchase price, was intended as, at least, part payment of Katsuno's stock subscription. Certificates for all of the stock were issued to Katsuno and the other subscribers, in accordance with their respective subscriptions. Apparently the subscribers, other than Katsuno, never paid anything on their subscriptions, those subscriptions being made to qualify the subscribers as officers of the corporation. On May 4, 1921, Mrs. Murphy, having succeeded to the ownership of White's share of stock, became a trustee and the secretary and treasurer of the corporation. Katsuno has, at all times, been the manager of the business of the corporation in the growing and marketing of its produce, the purchase of implements and supplies, and the making of improvements upon the land, handling the larger portion of its funds in that behalf, though some of the funds have been handled by Mrs. Murphy, as treasurer.

On May 17, 1921, Katsuno duly assigned in writing to his minor daughter, Yoshiko Katsuno, a native born citizen of the United States, his 1997 shares of the stock of the corporation, at the same time surrendering to Mrs. Murphy as secretary his certificate therefor,

reciting in his formal written assignment, as consideration therefor, one dollar and "love and affection," and a new certificate was issued for those shares, evidencing ownership thereof in the daughter, Yoshiko Katsuno, possession of that certificate being temporarily retained by Mrs. Murphy, the secretary; she also, as secretary, retaining the former certificate and formal assignment thereof made by Katsuno. On that same day, one of the other shares of the stock was transferred to Katsuno, and he thereafter continued as manager of the business of the corporation, and, since then, has also been its president. On May 31, 1921, Mrs. Murphy was, by the superior court for King county, duly appointed guardian of the estate of the minor daughter, Yoshiko Katsuno, which estate consisted of the 1997 shares of the stock of the corporation assigned to her by Katsuno. Mrs. Murphy thereupon, as such guardian, received possession of the certificate evidencing the ownership of those shares of stock in Yoshiko Katsuno, and has ever since held such possession jointly with the surety company, who is surety upon her guardianship bond, in a safe deposit box, accessible only to herself and her surety.

This action being commenced and trial had, final judgment was rendered by the superior court for King county on April 15, 1924, decreeing, in substance, that the defendant minor daughter, Yoshiko Katsuno, has no right, title or interest in the land; and that all the right, title and interest in the land, held by the White Rivers Gardens, Inc., and S. Katsuno, be escheated to the state of Washington, subject only to the rights therein of the defendant, D. K. Welt, it appearing that a considerable portion of the purchase price, under his contract for the sale of the land, has not been paid and that, for that reason, he rightfully still retains legal title to the land. This, I think, is a fair summary of the controlling facts and not materially in conflict with the views of the trial judge, when his findings are read apart from what I deem to be conclusions of law, rather than findings of fact.

The evidence introduced upon the trial took a wide range, touching the nature and extent of the control Katsuno exercised over the land and the affairs of the corporation; he and the other trustees of the corporation claiming that he was acting only as an employee or officer of the corporation, and it being claimed in behalf of the state that his control was, in effect, an exercise of ownership over the land in his own right. I think it unnecessary to follow counsel into this maze of details. It seems to me, that what Katsuno did in the way of assuming management of the land and the business of the corporation, after he caused White to transfer the whole contract interest in the land to the corporation in at least part payment of his subscription for 1997 shares of its stock, and after he transferred those shares of stock to his minor daughter, ought to be viewed with a great degree of caution, in so far as such management is sought to

be put in the scales as weighing against the rights of this citizen corporation, and thereby, in effect, against the rights of the minor daughter, who is a native born citizen of the United States. If it can be seen as a matter of law that, by the first of those transfers, viewed in the light of the latter, there was thereby vested in the corporation an indefeasible title to the land, as against any claim that Katsuno might ever make thereto, then it seems to me past understanding how it can be said that the corporation holds the land in trust for Katsuno.

It may be that, in this continued and somewhat extensive control assumed by Katsuno over the land and the affairs of the corporation, there can be found substantial ground for arguing that Katsuno's intent had been, from the beginning, to in some way circumvent the prohibition of our constitution against alien ownership of land in our state. We are to remember, however, that we are here concerned only with the outwardly expressed words and acts of Katsuno, as touching the question of his having legally effectually divested himself of all interest in the land, and the vesting of ownership thereto in the corporation, a United States citizen corporation, by virtue of practically all of its capital stock being owned by the minor, Yoshiko Katsuno, a native born citizen of the United States. In viewing the intentions and motives of Katsuno, however much the facts and circumstances may warrant criticism thereof, we are to keep constantly in mind that we are dealing with the claimed rights of the White River Gardens, Inc., a United States citizen corporation, and, in effect, with the rights of the owner of practically all the stock of the corporation, who is also a citizen of the United States.

It has become the settled law of this state, that the state can not successfully challenge an alien's ownership in land, looking to the escheating of such land, except such challenge be made in an appropriate action in court commenced by the state seeking escheat, while the ownership is vested in an alien; and, also, that such alien ownership can, before the state so challenges it and seeks escheat, be effectually vested in one not an alien, by appropriate grant from the alien, and such grantee thereby become fully vested with the ownership possessed by the alien, entirely freed from the state's right of escheat. *Oregon Mortgage Co. v. Carstens*, 16 Wash. 165, 47 Pac. 421, 35 L. R. A. 841; *Goon Gan v. Richardson*, 16 Wash. 373, 47 Pac. 762; *Abrams v. State*, 45 Wash. 327, 88 Pac. 327, 122 Am. St. 914, 13 Ann. Cas. 527, 9 L. R. A. (N. S.) 186; *State ex rel. Atkinson v. World Real Estate Comm. Co.*, 46 Wash. 104, 89 Pac. 471; *Keene v. Zindorf*, 81 Wash. 152, 142 Pac. 484; *Prentice v. How*, 84 Wash. 136, 146 Pac. 388; *State v. Kosai*, 133 Wash. 442, 234 Pac. 5.

When the private owner is a corporation and a majority of all its stock comes into the ownership of citizens and so remains at

the time the state seeks escheat, though a majority of its stock was in alien ownership at the time of the acquisition of the land, the state's right of escheat no longer exists. Such change to citizenship by a corporation, manifestly, is the same in its effect as the change to citizenship of a natural person, with respect to which the general rule is well stated in the text of 2 C. J. 1051, as follows:

"Where an alien who has acquired title to land by purchase acquires citizenship before proceedings have been instituted by the state to defeat his title, his title is thereby rendered perfect as against the state."

This rule is supported by abundant authority.

This action is, concededly, prosecuted upon the theory that the White River Gardens, Inc., holds the legal title to the contract interest in this land in trust for Katsuno. Now, the only showing, as I read this record, lending any support to this theory, is the resulting trust, originally created in favor of Katsuno by his furnishing to White the $5,000 to make the first payment upon the purchase price of the land and causing White to enter into that contract in White's own name, and the assumption by Katsuno, with the apparent permission therefor by the trustees of White River Gardens, Inc., of control over the land and affairs of that corporation, in which Katsuno had caused the legal title to the whole contract interest in the land to be vested in part payment of his stock subscription. Though White held the contract interest in the land for Katsuno by virtue of the resulting trust, manifestly the corporation did not so hold that interest, because it paid for that interest in the issuance of the stock to Katsuno.

The trustees of the corporation testified, that there was no understanding on the part of the corporation that it was to hold this contract interest in the land in trust for Katsuno. Katsuno also so testifies; and he further testified that the transfer of his stock to his minor daughter, Yoshiko Katsuno, a native born citizen of the United States, was intended as an absolute gift to her. As to the latter, the law would so presume, in view of the transferee being his daughter and there being no substantial valuable consideration for the transfer. *Adley v. Pletcher*, 55 Wash. 82, 104 Pac. 167. How, then, can it be held, with any show of reason, that Katsuno can ever, by any legal proceeding, enforce and draw to himself, as a beneficiary, any rights under this alleged trust, by which it is claimed the corporation holds the title to the contract interest in the land for him?

It is true, let us concede, that Katsuno has lived upon this land and managed it, in such manner as to suggest, in a considerable degree, dominion over it in the nature of an assertion of his personal ownership. While this may, in some measure, point to the motives and intent of Katsuno, entertained by him, more particularly in the

inception of the enterprise, it does not, as I view the case, militate against the present claimed legal rights of the corporation and its stockholders, the principal one of which, owning nearly all of its stock, is this citizen minor, Yoshiko Katsuno.

Are the legal rights of the corporation and such a majority stockholder, a minor, to be held for naught by this assumed control over the land and the affairs of the corporation, though consented to by its trustees, one of whom was the minor's guardian? If it be true, that Katsuno's management of the land and the affairs of the corporation, and the acquiescence therein by its trustees; are to be ever so strongly condemned, are the rights of the corporation and this minor to be swept away, upon the theory that the trustees of the corporation are consenting to such acts on the part of Katsuno? Such acts of Katsuno and consent of the trustees, I think, did not impair the legal rights of the corporation and its stockholders, nor did they confer or secure the semblance of a trust right upon Katsuno; and this, to my mind, is the controlling consideration, determinable against any claim which might be made by Katsuno, and therefore determinable against the state's present claim of escheat.

Much is said in the briefs and argument of counsel for the state, rested upon the theory of fraud on the part of Katsuno in his efforts, as it is claimed, looking to the circumvention of our constitutional alien land ownership prohibition. It is not enough, to look down through this record and see some possible sinister motive on the part of Katsuno, but we must go farther and see, whether or not by what he has actually done, first, in causing this whole contract interest in the land to be transferred to the corporation in part payment of his stock subscription, and second, in the voluntary transfer of his 1997 shares of capital stock in the corporation by himself to his citizen minor daughter, Yoshiko Katsuno,, avowedly as a gift to her, he has effectually divested himself of all interest in the land beyond recall. If Katsuno has, in legal effect, so parted with whatever interest he ever had in this land, as I think he has, then it is, to me, inconceivable that the corporation holds any interest therein in trust for him.

Nothing could seem plainer, than that the reservation by the state of its right of escheat is nothing but the reservation of a remedy on the part of the state. It is not the end, but the means to the end, which the state seeks, that is, the avoidance of alien ownership of agricultural lands. In *Oregon Mortgage Co. v. Carstens*, 16 Wash. 165, 170, 47 Pac. 421, 35 L. R. A. 841, this court quoted from Devlin on Deeds, § 131, with approval, the following:

"It is not the object of the state to add to its revenue by the confiscation of property, but to protect itself from the danger of allowing persons who owe it no allegiance to own land within its boundaries."

I am of the opinion, that the White River Gardens, Inc., has not, at any time since Katsuno caused the transfer to that corporation of his contract interest in the land in part payment of his stock subscription, held title to that contract interest in trust for Katsuno; and that the state has not possessed the right of escheat with reference to the land, at any time since Katsuno transferred his 1997 shares of stock in the White River Gardens, Inc., as a gift to his minor daughter, which transfer gave to that corporation full citizenship rights for the purpose of ownership in land in this state.

The judgment should be reversed.

MAIN, and ASKREN, JJ., concur with PARKER, J.